UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHNNIE TUTTLE, | ) | Case No.: 1:08 CV 288 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| CHRIS OEHLER, *et al.*, | ) | |
| | ) | |
| Defendants | ) | ORDER |

Plaintiff Johnnie Tuttle ("Tuttle" or "Plaintiff") files the instant disability discrimination suit against Defendants Chris Oehler ("Oehler"), Shiloh Industries Inc., and Shiloh Corporation (collectively, "Shiloh" or "Defendants"). Currently pending before the court are the following Motions: (1) Defendant Shiloh's Motion for Summary Judgment (ECF No. 22); (2) Defendant Oehler's Motion for Summary Judgment (ECF No. 23); and (3) Plaintiff Tuttle's Motion for Leave to File *Instanter* Plaintiff's Consolidated Surreply in Opposition to Defendants' Motions for Summary Judgment (ECF No. 32). For the reasons stated herein, the court grants Plaintiff's Motion for Leave to File Surreply and grants Defendants' Motions for Summary Judgment.

# I.  FACTS AND PROCEDURAL HISTORY

## A.  Tuttle's Employment Background

Shiloh is an automotive parts manufacturer with one of its plants located in Mansfield, Ohio. From 1973 to 2007, Tuttle worked as a production laborer for Shiloh in the Mansfield plant, where he was represented by a union.  Tuttle worked at Shiloh mainly without incident until September of 2005.  In 1995, his son died in a fire.  Tuttle was eventually prescribed anti-depressants to deal with this difficult loss.  (Tuttle Dep. at 20-22, 36-38, ECF No. 22-2.)  Approximately eight years later, Tuttle was diagnosed with major depressive disorder, stemming from his son's untimely death.

### 1. September 2005 - Dan Armstrong Incident

In September of 2005, Tuttle had a disagreement with his supervisor, Dan Armstrong ("Armstrong"), as discussed herein.  According to Tuttle, Armstrong noticed that Tuttle was not at his assigned machine, and questioned a co-worker of Tuttle's whereabouts.  (Tuttle Dep. at 45.) Upon his return, Tuttle was informed of Armstrong's inquiry, which upset him, and prompted him to discuss the situation with Chris Oehler ("Oehler"), an Operations Manager of the plant, and one of Tuttle's supervisors.  (Tuttle Dep. at 26.)

About a week later, Tuttle, and his wife, Lisa Tuttle ("Mrs. Tuttle"), saw Armstrong at a local gas station, and noticed him laughing at Tuttle.  (Armstrong Aff. at ¶ 5, ECF No. 22-15; Tuttle Dep. at 47.)  According to Armstrong, Tuttle  called him derogatory names and told him that he wanted to go to the baseball park to fight him, which Armstrong perceived as a threat and reported to the police.  (Armstrong Aff. at ¶ 5.)  Tuttle, on the other hand, maintains that he did not threaten to physically harm him.  (Tuttle Dep. at 48.)  Armstrong provided Shiloh with a statement detailing the incident.  (Armstrong Dec. Ex. A.)

-2-

On the day after Armstrong filed his police report, Shiloh's Human Resource Manager, Chuck Timothy ("Timothy"), as well as union representatives, Terry Booker ("Booker") and Junior Rose ("Rose"), held a meeting to discuss the incident and potential discipline with Tuttle. During this meeting, Tuttle began to have a "meltdown," and the conversation turned from discipline to helping Tuttle with his apparent mental condition. (Booker Dep. at 6-9, ECF No. 22-4.) Tuttle complained about the stress he was under, which stemmed from his son's death, and stated he was too upset to work. (*Id.* at 8-9.) Tuttle requested to be allowed to go home. Shiloh and the union representatives agreed that allowing him time off was the best course of action, and placed him on medical leave. Tuttle returned to work on December 19, 2005, and neither he, nor his physicians, requested any accommodations upon his return to work. (Tuttle Dep. at 101.)

### 2. Tuttle's Requests

Upon Tuttle's return from medical leave, he requested of officials at Shiloh, to have a copy of the statement Armstrong had provided regarding the gas station incident. The company refused, but Tuttle persisted in his requests. On one occasion, when Tuttle again requested a copy of the statement from Oehler, Tuttle indicates that Oehler became enraged at his request, and started screaming at him that he was fired. (Tuttle Dep. at 56.) However, Tuttle was never disciplined or terminated as a result of this incident.

Tuttle also requested of Shiloh management, that because of his nerves and fragile mental state, other employees leave him alone and refrain from touching him. (Rose Dep. 24-27, ECF No. 22-10.) Shiloh's management, however, denied this request, reasoning that because of the noise level in the plants and the fact that employees are required to wear ear plugs to protect their hearing, it is often necessary to use hand signals and touch one another to communicate.

-3-

### 3.  Other Purported Incidents of Harassment

In addition, Tuttle claims that he was harassed in some form on a daily basis, including the following incidents:

- Oehler told Tuttle's wife they no longer wanted him working there.  (Mrs. Tuttle Dep. at 83-84, ECF No. 22-8.)

- Defendants asked questions about Tuttle's disability and medication.  (Tuttle Dep. at 67, 72, 76-77; Mrs. Tuttle Dep. at 87.)

- Oehler informed Tuttle that he needed to have his medication checked out.  (Tuttle Dep. at 78.)

- Sealey asked Mrs. Tuttle how John would be without his medication, and stated that "it is a concern when people are on medication."  (Mrs. Tuttle Dep. at 87.)

- Timothy asked Mrs. Tuttle whether Tuttle could do his job with his mental condition. (Tuttle Dep. at 77.)

- Oehler told Mrs. Tuttle that he believed Tuttle was going to hurt people.  (Tuttle Dep. at 99.)

- There were rumors, around the plant, which can neither be attributed to Oehler nor management, that Tuttle was crazy, would go postal, and would shoot the place up. (Bradford Dep. at 33, ECF No. 22-5; Rose Dep. at 28; Tuttle Dep. at 91-92, 99-100, ECF No. 22-3.)

- Oehler would stare at Tuttle.  (Tuttle Aff. ¶ 5;  Tuttle Dep. at 62-66.)

- Defendants often told him he was fired, but did not fire him.  (Tuttle Dep. at 56-57, 60, 72-73, 97.)

- Oehler snuck up behind Tuttle while he was operating the Timesaver Grinder, and put his hands on his shoulders, prior to yelling at Tuttle that he was fired. (Tuttle Dep. at  97.)

- Gary Burgett ("Burgett") began incessantly calling his wife and when Tuttle confronted him, got Oehler to threaten to fire him. (Tuttle Dep. at 58-60; Mrs. Tuttle Dep. at 44-47.)

- Defendants sent him home on medical leave against his wishes and told him that his continued employment was dependent upon his receiving help. (Tuttle Dep. Ex. 9, 14.)

As can be readily seen, most of the complaints related to issues regarding his health and fitness to work as discussed herein.

4. Production Reports Incident

Shiloh employees fill out daily reports regarding their work performed each day.  (Tuttle Dep. at 89.)  On April 4, 2006, Tuttle wrote the following on the bottom of his report: "I don't know if I can live up to your standards.  I don't think you ever had to work a hard day in your life. You may want to ask yourself this question."  (Tuttle Dep. Ex. 16.)  The next day Tuttle wrote the following on the bottom of his report: "May God help ALL of Us.  The Day will come for all of US[.] Some sooner Than others."  (Tuttle Dep. Ex. 17.)  Viewing those statements as threats, Kevin Cleary ("Cleary"), Plant Manager, initially wanted Tuttle removed from the premises, but Oehler intervened, believing Tuttle needed help and not discipline.  (Booker Dep. at 15.)  Officials from Shiloh met with Tuttle and placed him on leave again.  (Tuttle Dep. at 95.)  Tuttle returned to work in the fall of 2006 after 5 months of paid leave, and neither he, nor his physicians, requested any accommodations upon his return to work.  (*Id.* at 94-96, 101.)

5.  February 8, 2007 Incident

Tuttle contends that the continued harassment he was subjected to led to the incident that occurred between himself and Oehler on February 8, 2007. Tuttle was working when Oehler came up behind him and suddenly grabbed him, pinching his left arm so hard that it felt as though it were a "bee sting." (Tuttle Dep. at 13, 52.) Oehler, along with other witnesses, contend that he only walked up to Tuttle and tapped him on the shoulder, while saying "good morning." (Cleary Dep. at 49, ECF No. 22-6; Armstrong Dec. ¶¶ 9-10; Davis Dep. at 10; Oehler Dep. at 172-73; Def. Dep. Ex. 60). Tuttle called for the union steward following this incident, and only reported to him that Oehler had "patted him on the back." (Lybarger Dep. at 8, 15-17.) Tuttle did not report to him that he had been pinched by Oehler. (*Id.* at 8.)

Tuttle filed a grievance with the union on February 22, 2007, which was ultimately denied. (Tuttle Dep. Ex. 17, 18.) The company investigated the incident, but found that the charge was not well founded since every eyewitness and the union steward all stated that Oehler had not touched Tuttle inappropriately. (Cleary Dep. at 81-82.) Tuttle had no further contact with Oehler from February of 2007 to August of 2007. (Tuttle Dep. at 138.)

Tuttle then turned to Laura Sealey ("Sealey"), Shiloh's Human Resources Representative, for assistance, showing her pictures in March of 2007 of an alleged bruise from Oehler from the February incident. (Def. Dep. Ex. 98, 99; Tuttle Dep. at 120.) Oehler and the other managers at Sealey's direction, drafted statements on the incident. (Tuttle Dep. Ex. 10, 11, 20, 22, 23.) Each of the statements indicated no harassment had occurred. (*Id.*) The company again investigated, but found based on statements from every eyewitness, Oehler had only tapped Tuttle on the shoulder and said "good morning." (Cleary Dep. at 105-107.)

<u>6. Termination of Tuttle's Employment</u>

-6-

### a. Criminal suit against Oehler

Finding no one at Shiloh was willing to help, Tuttle maintains he was left with no choice but to pursue criminal charges against Oehler in June of 2007 for allegedly pinching him.  (Tuttle Dep. at 122-23, 29; Mrs. Tuttle Dep. 107-09.)  The case went to trial, and after hearing eyewitness testimony, the judge ruled for Oehler, acquitting him.  (Tuttle Dep. Ex. 85.)  Tuttle never returned to work again following the conclusion of the criminal case.  (Tuttle Dep. at 15, 114.)

### b. "Constructive termination"

According to Tuttle, the harassment he repeatedly encountered had a significant impact on him and his health, causing him to be hospitalized in August of 2007.  (Tuttle Dep. at 134-35.) Tuttle's psychiatrist, Dr. Rashid Pervez, M.D., stated that Tuttle's Major Depressive Disorder had manifested when he began encountering problems at work, and that "his depression is a direct result of the stress of his employment."  (Def. Dep. Ex. 44.)  Dr. Pervez concluded that by August 2007, it was "impossible" for Tuttle to ever return to work.  (Pervez Dep. at 72, ECF No. 27-7.)  While in treatment, Tuttle admitted that he did not always take his medications.  (Def. Dep. Ex. 52.) According to Tuttle, the totality of the events that had been occurring led him to conclude that he had been constructively terminated because the working conditions were so severe, intolerable, and dangerous that he could no longer continue working there. (Tuttle Aff.  ¶ 8.)

### B.  The Instant Suit

Tuttle maintains that through the constant instances of misconduct by the Defendants, he was subjected to harassment and a hostile work environment.  Tuttle claims he was subjected to harassment through unwelcome touching.  (Tuttle Dep. at 97.)  He alleges he was forced to endure daily harassment from 2005 to 2007. (Tuttle Dep. at 64, 66.)  Additionally, Tuttle asserts that the

Defendants intentionally created a hostile work environment when they became aware of his disability, hoping it would lead to his termination or resignation.  (Mrs. Tuttle Dep. at 83-84.)

On February 5, 2008, Plaintiff filed suit against the Defendants, Chris Oehler and Shiloh Industries, Inc. (Compl., ECF No. 1.)  Plaintiff alleges that he suffered disability discrimination and harassment by the Defendants, having been subjected to verbal, mental, emotional and physical harassment, and abuse because of his disability.  (Compl. ¶ 20.)  He claims to have suffered an assault and battery as a result of the February 8, 2007 incident with Oehler. (Compl. ¶ 26.)  Plaintiff further alleges the intentional infliction of emotional distress by the Defendants.  (Compl. ¶ 32-39.)

## II. SUMMARY JUDGMENT STANDARD

Defendants filed Motions for Summary Judgment on October 5, 2009, arguing that Plaintiff was not constructively discharged, harassed, or assaulted, and as a result judgment should be entered in their favor as a matter of law.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. ...

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary

standards.  Thus, in most cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party has the burden of production to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).  If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*.

If the moving party meets its burden of production, then the non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id*.  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

## III. ANALYSIS

### A. Chris Oehler

Defendant Oehler seeks summary judgment on the basis that he is not a proper defendant under the ADA.  He is correct.  The ADA does not provide for individual liability in disability discrimination cases.  *See Wathen v. General Electric*, 115 F.3d 400, 404-405 (6th Cir. 1997). However, Plaintiff has filed this action claiming discrimination in violation of both the ADA and the Ohio Revised Code § 4112.02.  Under § 4112.02 though, individual supervisors and managers may be sued along with employers.  *See Genaro v. Central Transport, Inc.*, 84 Ohio St. 3d 293 (1999).  As Oehler served as the Operations Manager for Shiloh's Blanking Division, he is properly joined as a party to this action.  Therefore, summary judgment is granted in favor of Defendant Oehler on Plaintiff's ADA claim, and is denied in regard to his claim under Ohio Rev. Code § 4112.02 on this basis.

### B. Disability Discrimination and Harassment

#### 1. Hostile Work Environment

##### a. Standard

Plaintiff alleges that he was harassed and discriminated against by the Defendants on the basis of his disability, and was subjected to a hostile work environment as a result.  In order to constitute a hostile work environment, the harassment must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions

-10-

of employment.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris,* 510 U.S. at 21.  In order to be successful on a claim of hostile work environment based on disability, the Sixth Circuit has stated that a plaintiff must prove that the harassment was sufficiently severe or pervasive to alter the conditions of his employment, and create an environment that a reasonable person would find hostile or abusive, which the victim must subjectively regard as abusive.  *See Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000).  *See also Crawford v. Medina Hosp.,* 96 F.3d 830, 834 (6th Cir. 1996) (holding that the elements of hostile work environment are the same regardless of the discrimination context under which the claim arises).  Therefore, there is both an objective and subjective component.  In making this determination, the court must consider the totality of the circumstances, assessing all of the incidents of harassment alleged by the plaintiff together, and not separately analyzing each incident.  *Wiliams v. GMC*, 187 F.3d 553, 562-64 (6th Cir. 1999).  The Supreme Court has stated that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."  *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 91-82 (1998).

Plaintiff has filed this action claiming discrimination in violation of both the ADA and the Ohio Revised Code § 4112.02.  In deciding cases under Ohio Rev. Code § 4112.02, the Ohio Supreme Court has encouraged courts to look to the ADA for guidance in the interpretation of Ohio's prohibition on disability discrimination.  *See City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 573 (1998).  Consequently, both the ADA and the state law claim should therefore be analyzed using ADA case law for guidance.

b. Severe or Pervasive Conduct

In determining whether conduct is severe or pervasive enough to rise to the level of a hostile work environment, the court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. All of the conduct complained of by Tuttle took place over the span of four years. He points to 4 or 5 primary incidents, frequent staring and yelling by Oehler, and the phone calls by Burgett, as support for his claim of harassment. Some of these actions complained of by Tuttle at Shiloh are no more than offensive utterances, not rising to the level of harassment. These actions are no more than immature behavior and personality conflicts. *See Johnson v. City of Mason*, 101 F. Supp. 2d 566 (6th Cir. 2000). Analyzing these incidents in their totality, and not as to their effect in each separate incident, would not lead a reasonable person to conclude the conduct unreasonably interferes with an employee's work performance and that Tuttle had been subjected to a hostile work environment. Therefore, while some of them may have been unpleasant, and were no doubt upsetting to Tuttle, they do not rise to the level of an environment that a reasonable person would find hostile or abusive for the reasons discussed herein.

Defendants maintain that a review of pertinent cases will demonstrate that they are entitled to summary judgment on the hostile work environment claim. In *Coulson v. Goodyear Tire & Rubber Co.*, 31 F. App'x 851 (6th Cir. 2002), the Sixth Circuit affirmed the granting of summary judgment on the claim of the plaintiff who suffered from major depression, and alleged that he was repeatedly called names like "looney toon," "wacko," or "crazy." The court affirmed that the alleged name calling by the plaintiff's colleagues did not constitute a hostile work environment actionable under the ADA. *Id*. In *Denczak v. Ford Motor Co.*, 407 F. Supp. 2d 880 (N.D. Ohio 2005), the court granted summary judgment on the claim of a plaintiff who contended that the

questioning of his frequent bathroom use constituted a hostile work environment.  The court found that this was not sufficiently severe or pervasive to constitute a hostile work environment, and that employers have a right to know about their employees' ability to work.  *Id*.  Defendants maintain Tuttle's alleged claims of pervasive conduct by Oehler are akin to the claims on which summary judgment was granted in those cases.  Like *Coulson*, Tuttle's complaints of rumors about him being crazy does not amount to sufficiently severe or pervasive harassment.  This is true even when considered together with his being questioned about his medication and how he was doing from time to time.  As the court stated in *Denczak,* 407 F. Supp.2d at 893, courts have found employers have a right to know whether their employees have the ability to work.  Therefore, the rumors of his being crazy and the questioning in regard to his mental health here, did not constitute harassment that a reasonable person would find hostile or abusive. The court finds the Defendants' arguments well taken.

Tuttle's claims are unlike those of plaintiffs in the cases discussed below who faced substantial obstacles to performing their jobs once their employer became aware of the disability.  In *Locsei v. Mayfield City Sch. Dist.*, No. 75277, 2000 Ohio App. LEXIS 1179 (Ohio App. Mar. 13, 2000), the plaintiff had suffered a leg injury and as a result of this disability had difficulty meeting the requirements of his job as a janitor.  His requests for reasonable accommodations were denied.  *Id*.  He also faced greater scrutiny than his coworkers, such as being followed by a supervisor for weeks, encountered threats from coworkers, and was intentionally transferred to an area in which he was likely to fail without reasonable accommodations.  *Id*.  Tuttle, on the other hand, never made a request for any accommodations upon his return from medical leaves.  The alleged incidents of physical conduct, staring, and comments by company officials are also distinguishable, as they must be considered in the context of the comments he made on the bottom of his production reports, such as "May <u>God</u> help ALL of <u>Us</u>.  The Day will <u>come</u> for all of US[.]  Some sooner Than <u>others</u>."

-13-

(Tuttle Dep. Ex. 17.)  Defendants had a legitimate reason to be concerned about how he was doing and if he was taking his medication.  Further, Tuttle did not face greater demands upon his return to work from his various leaves.  He had to do the same tasks he had done previously.

Tuttle's alleged harassment is also not comparable to the kinds of harassment suffered by plaintiffs which the courts have found are sufficient to withstand a summary judgment motion.  In *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008), the court found a prima facie showing of hostile work environment when a male supervisor made continual, crass requests for oral sex, regularly rubbed against plaintiff with his private parts, and touched or grabbed her "every time" they worked together. Tuttle contends his claims of continued harassment are similar. However,  Tuttle has alleged markedly less severe incidents of harassment than those claimed in *Hawkins*.

Further, Tuttle contends that *Hawkins* supports the denial of summary judgment because there the court indicated that "harassing comments and even just 'one act of touching'" can defeat a defendant's summary judgment motion.  (Opp'n. Defs.' Mot. Summ. J. at 16, ECF No. 26.) However, Plaintiff's reliance on *Hawkins* is misplaced.  In that case, the court sought to emphasize harassing comments accompanied by an act of touching was more severe than harassing comments alone, but this was discussed in the context of particularly egregious harassment faced by the plaintiff.  *Hawkins*, 517 F.3d at 334-35.  The *Hawkins* court relied on its previous reasoning in *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999), in finding that harassing sexual comments with an element of physical invasion was sufficient to withstand summary judgment on a harassment claim.  In *Williams*, the harasser:

> (1) used the "F-word" and said: "Hey slut" in William's presence, (2) told Williams that she could "rub up" against him anytime, (3) said: "You would kill me, Marilyn. I don't know if I can handle it, but I'd die with a smile on my face," (4) walked up behind Williams and said: "Back up: just back up," (5) said "I'm sick and tired of these fucking

-14-

women," and (6) at one point, when he saw her writing "Hancock," he touched her neck and said: "You left the dick out of the hand."

*Id*. at 334.  The *Hawkins* court noted the case in front of them was much worse since the harasser there was:

> "[A]lways doing something," such as "always rubbing her back and touching her," and that "she got sick of telling him to stop." Cunningham not only asserted that Robinson's actions were continual, but stated that Robinson repeatedly made crude requests for oral sex, solicited a sexual relationship, and invaded her physical space by rubbing her, touching her, and trying to "feel on her."

*Id*.  Based on that information, the court found the plaintiff to have alleged sufficient facts to survive summary judgment.  In *Hawkins* and *Williams*, the incidents complained of by the plaintiffs were markedly more severe than the conduct complained of in this case.   The alleged harassment and physical contact complained of by Tuttle does not rise to the level of the harassment and physical invasion found by *Hawkins* to be sufficient to defeat a defendant's summary judgment motion.  As can be readily seen, many of those incidents relate to communications with Tuttle or his wife about Tuttle's mental status and his ability to perform his job.  Such an inquiry by management would be justified in light of the fact that he has had mental health issues related to the death of his son on an ongoing basis since 1995, and has had to take several leaves of absence to take care of problems related thereto.  The incidents relied on by Tuttle wold not lead a reasonable person to conclude that the conduct unreasonably interferes with the employee's work performance, and cannot be categorized as severe or pervasive conduct sufficient to survive summary judgment.

As indicated above, determining if a work environment rises to the level of hostile work environment is based on a subjective and objective inquiry.  A reasonable person must find that the harassment was severe or pervasive enough to constitute a hostile or abusive work environment, and the victim must subjectively regard the environment as abusive.  *Bowman*, 220 F.3d at 463.  Tuttle likely regarded the environment as abusive, but a reasonable person would not find that the

conditions that existed at Shiloh created a hostile work environment. Although these incidents may have caused Tuttle to feel unwelcome and harassed, meeting only the subjective component is not enough to survive summary judgment in light of the court's finding in regard to the objective standard. Thus, summary judgment on this claim must be granted.

### 2. Constructive Discharge

Tuttle alleges that he was subject to disability discrimination and harassment which resulted in his constructive discharge. The plaintiff bears the initial burden of establishing a prima facie case of discrimination by the defendants. *See Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099 (6th Cir. 2008), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.,* 129 S.Ct. 2343 (2009). A prima facie claim for disability discrimination can be established with direct or indirect evidence. *Mauzy v. Kelly Services, Inc.*, 664 N.E.2d 1272, 1276-1281 (1996).

### a. Direct Evidence

If a plaintiff supplies direct evidence, which can be shown through direct or circumstantial evidence, he or she has made a prima facie case for disability discrimination. *See, e.g., Id*; *Talley v. Bravo Pitino Restaurant, Ltd..,* 61 F.3d 1241 (6th Cir. 1995); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). Direct evidence "refers to a method of proof, not a type of evidence. It means that a plaintiff may establish a prima facie case of [] discrimination directly by presenting evidence, of any nature, to show that the employer more likely than not was motivated by discriminatory intent." *Mauzy*, 664 N.E.2d at 1279. Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). Direct evidence of discrimination would be present if an employer says "I fired you because you are disabled." *Kittle v. Cynocom Corp.*, 232 F. Supp.2d 867, 875 (S.D. Ohio 2002) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998).

Tuttle has attempted to provide direct evidence through the Defendants' purported statements that they did not want him at Shiloh, the rumors throughout the plant, and the refusal to grant his request that he not be touched. However, these incidents are not direct evidence of the discriminatory intent of Defendants, but instead require many inferences. The rumors to which he refers regarding him being crazy, do not provide direct evidence that Shiloh discriminated against Tuttle, as he can neither attribute the starting of the rumors, nor the spread of the rumors, to any supervisors or members of upper-level management at Shiloh. (Tuttle Dep. at 91-92, 99-100.) Tuttle's request that he not be touched is also not direct evidence of discrimination. Tuttle and his physician admit that he never made a request for an accommodation; there was nothing he needed to do his job. (Tuttle Dep. at 101; Pervez Dep. at 18, ECF No. 27-7.) Therefore, Tuttle is unable to provide any direct evidence of disability discrimination.

### b. Indirect Evidence

In the absence of direct evidence of Defendants' discriminatory intent, the indirect evidence method for establishing a prima facie case of discrimination must be used. The indirect method uses the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Once a prima facie case of discrimination has been shown through indirect evidence, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *Talley,* 542 F.3d at 1105. If the defendant is able to meet this burden, the plaintiff must then show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination. *Id.* To establish a prima facie case for discrimination under the ADA, the plaintiff must show "(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of disability." *Id.* (internal

citations omitted).  In addition to the third requirement, there must also be an adverse employment action that follows.  *Id.*  An adverse employment action can be demonstrated through constructive discharge, which is what Tuttle has alleged.  *Id.*; *see also Logan v. Denny's Inc.*, 259 F.3d 558 (6th Cir. 2001).  Defendants do not dispute the first three requirements, only whether he was constructively discharged.  Therefore, Tuttle only needs to show that he was discriminated against on the basis of disability, and it resulted in his constructive discharge, to establish a prima facie case of discrimination.

A finding of constructive discharge requires the objective determination that the plaintiff's working conditions were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign," along with an evaluation of the intentions behind the employer's actions and foreseeability of the employee's reaction.  *Yates v. Avco Corp.,* 819 F.2d 630, 637 (6th Cir. 1987).  To determine whether a reasonable person would have felt compelled to resign, the Sixth Circuit has adopted the Fifth Circuit's approach in determining if an employer deliberately created intolerable working conditions as perceived by a reasonable person.  *Logan*, 259 F.3d at 568-69.  The Fifth Circuit used various factors to make this determination, only one of which is applicable here, badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation.  *Id*.  Tuttle contends he meets this factor based on his allegations of yelling, staring, two alleged incidents of touching, threats of termination, questioning of his medical condition and medication, as well as claims he was not wanted there.

Tuttle asserts that the plaintiff's claims in *Moon v. Gonzales*, No. 3:05-CV-102, 2007 U.S. Dist. LEXIS 27409 (M.D.Tenn. Mar. 29, 2007), are similar to his, and therefore his claim should also survive summary judgment.  However, Tuttle's claims can be distinguished from *Moon* in several aspects.  The plaintiff in *Moon* suffered from major depression, and upon his return from

leave faced numerous impediments to being able to adequately perform his job, such as being provided with a lengthy Performance Improvement Plan, being unable to receive his requested accommodation of a four day work week because of the significant amounts of work given to him, and was screamed at so loudly during weekly meetings with his supervisor that other people walking by could overhear. *Id*. at *5, 14-18.  Based on these incidents, the court concluded that there was an issue of material fact whether plaintiff suffered "badgering, harassment, or humiliation" calculated to encourage his resignation. *Id*. at *18-19.  In contrast, Tuttle did not request an accommodation upon his return from medical leave, and was not given additional requirements beyond his normal duties.  (Tuttle Dep. at 101.)  The court in *Moon* relied partly on the timing of the Performance Improvement Plan, and the fact that Moon was likely to be in a fragile state upon his return, as a basis for denying summary judgment. *Id*. at *15.  Tuttle, also may have been in a fragile state, as he too suffered from major depression, but he was not subjected to substantially greater requirements upon his return from work.  He had to do the same tasks he had done previously.  Tuttle's complaints of staring, yelling, phone calls by Burgett, and two instances of physical contact by Oehler, do not rise to the level of the incidents complained of by Moon, and they do not demonstrate Tuttle suffered "badgering, harassment, or humiliation" calculated to encourage his resignation. *See Logan*, 259 F.3d at 568-69.

Tuttle cannot demonstrate that  the incidents alleged were motivated by discrimination, or that the behavior warrants liability.  As the *Johnson* court stated, the "ADA does not prohibit all verbal or physical harassment in the workplace."  101 F. Supp. 2d at 577.  Just because Tuttle viewed his working conditions as unpleasant, does not make these incidents actionable, or constitute a constructive discharge on the basis of disability discrimination.  These incidents must be evaluated objectively, without consideration of Tuttle's "undue sensitivities." *Wilson v. Firestone Tire and*

*Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991). The employee has "an obligation not to assume the worst, and not to jump to conclusions too fast." *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987). Furthermore, unless conditions are "beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress." *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1015 (7th Cir. 1997). Quitting was not the only option for Tuttle. He could have remained at Shiloh, and sought redress through his union and/or Human Resources. *See Equal Employment Opportunity Commission v. Sears, Roebuck, & Co.,* 233 F.3d 432, 440-41 (7th Cir. 2000).

Tuttle's claim is further weakened by the delay in his resigning. Delay can defeat a claim of constructive discharge. *See, e.g., Coffey v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 194 F.3d 1311 (unpublished table decision), 1999 WL 824870, at *3 (6th Cir. Oct. 6, 1999) (finding that a delay "rebuts any inference that [a person] felt compelled to resign because of the alleged harassment he felt by his supervisors and defeats his claim of constructive discharge"); *Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991) (finding employee's resignation six months after last incident to be too great a time period to support a claim for constructive discharge). Tuttle alleges that the last incident complained of occurred in February of 2007, and that he had no contact with Oehler from February of 2007 to August of 2007. He did not resign until August of 2007, six months after the last incident. Therefore, his delay must defeat his claim of constructive discharge. Since Tuttle cannot make out a prima facie case of indirect evidence of discrimination, the additional parts of the *McDonnell Douglas* burden-shifting analysis do not need to be addressed.

Considering the alleged incidents of harassment which Tuttle catalogues, taken together, they were not sufficient to cause a reasonable person in Tuttle's shoes to find the working conditions so difficult or unpleasant he would be forced to resign. *Yates,* 819 F.2d at 637. This conclusion is

further compelled by, as discussed above, the fact that the last incident complained of by Tuttle had occurred many months before he resigned.  For the reasons stated above, the court finds that summary judgment on the issue of disability discrimination and harassment is appropriate, and the Defendants' Motions for Summary Judgment are granted on this claim.[1]

### C. Assault and Battery

Plaintiff has alleged claims of assault and battery by the Defendants.  Defendants do not dispute the physical contact between Oehler and Plaintiff, but merely categorize the assault as trivial. It is not appropriate for this court to weigh the evidence presented at summary judgment, but to decide as a matter of law whether genuine issues of fact exist. Under Ohio law, assault is the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact.  *Harris v. U.S.*, 422 F.3d 322, 330 (6th Cir. 2005).  Proof of physical injury is not required.  *Id*.  Ohio defines battery as an intentional uninvited contact with another.  *Id.* Therefore, as proof of physical injury is not required and Tuttle contends the contact was uninvited, there may be genuine issues of fact that exist on these claims.  However, all remaining federal claims have been dismissed, and the court declines to exercise supplemental jurisdiction over this claim pursuant to 28 U.S.C.A. § 1367(c)(3).

### D. Intentional Infliction of Emotional Distress

Plaintiff asserts a claim of intentional infliction of emotional distress by the Defendants.  To prevail on a claim of intentional infliction of emotional distress under Ohio law, a

---

[1]
> The court notes Plaintiff contends he has also raised claims of disparate treatment. (Opp. at 18.)  However, after a thorough reading of the Complaint, the court finds that Plaintiff has not raised any claims of disparate treatment. Therefore, Defendants have addressed all of Plaintiff's discrimination claims.

plaintiff must satisfy four elements: 1) the defendant intended to cause emotional distress or knew or should have known that the actions taken would result in emotional distress to the plaintiff; 2) the defendant's conduct was "extreme and outrageous"; 3) the defendant's actions proximately caused the plaintiff's psychic injury; and 4) the plaintiff's mental anguish is serious and "of a nature that 'no reasonable man could be expected to endure it.'"

*Boyd v. Bressler*, 18 F.App'x 360, 366-67 (6th Cir. 2001).  The conduct at issue is "outrageous" if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable to a civilized community."  *Id.* (internal citation omitted).  Even viewing the facts in a light most favorable to Plaintiff, it cannot be said that the actions allegedly committed by Defendants are "beyond all possible bounds of decency." *See Boyd*, 18 F. App'x at 367. The standard articulated by the Ohio Supreme Court stipulates that this cause of action is reserved for behavior of the most extreme sort.  *Yeager v. Local Union 20, Teamsters*, 453 N.E.2d 666 (1983) (abrogated on other grounds).  The alleged conduct forming the basis for this claim is insufficient to support a claim for intentional infliction of emotional distress, as the conduct does not qualify as outrageous.  Therefore, Plaintiff has failed to sufficiently state a case for intentional infliction of emotional distress, and summary judgment must be granted on this claim.

## IV. CONCLUSION

For the foregoing reasons the court grants Defendant Shiloh's Motion for Summary Judgment (ECF No. 22) on the hostile work environment, constructive discharge, and intentional infliction of emotional distress claim, and declines to exercise supplemental jurisdiction over the assault and battery claims. The court grants Defendant Oehler's Motion for Summary Judgment (ECF No. 23) on the discrimination, harassment, and intentional infliction of emotional distress claims, finds Oehler is not a proper defendant under the ADA, and declines to exercise supplemental

jurisdiction over the assault and battery claims.  The court also grants Plaintiff Tuttle's Motion for

Leave to File *Instanter* Plaintiff's Consolidated Surreply in Opposition to Defendants' Motions for

Summary Judgment (ECF No. 32).

IT IS SO ORDERED.

/S/ SOLOMON OLIVER, JR.
CHIEF JUDGE
UNITED STATES DISTRICT COURT

March 31, 2011